We'll hear Dole v. Adams. Good morning to you. Go right ahead. Thank you. May it please the court, my name is Thomas Duobo and I have the honor of representing Mr. Dole before you today. There is only one issue before the court today and that is the question of whether or not this transaction occurred in commerce and under the Consumer Protection Act. There is no other issue before the court and it is our position that the transaction between Mr. Dole and DISS partners was a commercial transaction and as such it occurred in commerce. This transaction was one offered to the public through a broker, included the purchase of real estate, included assistance with obtaining mortgages on real estate, had lease backs agreements whose terms were contained in a non-negotiable lease, and included subsequent loans to them as well. One of the issues that the defense has made in this case... Let's focus on floating fuels. You'll agree that that's sort of the... That is definitely, absolutely, your honor. Yes. So are these transactions that your client entered generally available in commerce? I mean, they're just pushed out there to, you know, the same people who are the cleaners from a door-to-door salesman? Well, I think, and that's the confusion here, your honor, is that the defense argument is that this is a complex transaction and therefore it should be removed from the, sort of, commerce. But the fact of the matter... We studied sale lease backs in, you know, advanced business tax or law school, even then and even now, they seem to be fairly complex transactions. Exactly, but even if they are, it doesn't mean that they shouldn't, they come outside of commerce. It's those types of actions that, I mean, if you define this as not commerce, then what are you saying for other acts, such as the Securities and Exchange Commission and the Federal Trade Commission, that they don't have the ability to, or the right to, or Congress doesn't have the right to implement regulations or laws? Congress can do what it wants. We're talking about the Vermont Legislature, however, and you and I are both fairly familiar with them. Absolutely, but the issue here, and that, you know, Vermont has interpreted the Commerce Act as being even much broader, and under Carter versus Galluzzi, they defined commerce as, you know, where they deemed, they said, Smith-Bell's Corollary claimed that the transaction did not occur in commerce is equally without merit. Although commerce is not defined in the Act, its ordinary meaning of interchange of goods and commodities, especially on a large scale, is commerce. Have we certified this to the Vermont Supreme Court? If you would like, I have no problem with that. I would, I did request that in our brief, that that be done. I think that they, that Fody Fuels is a very, very specific case. It had a three-part test, and there was a really good decision by Justice, sorry, by Bankruptcy Judge Colleen Brown and Inri Weaver, where she does an analysis of what is in commerce, and in that case, she cites and goes through the three standards for the, for commerce, and cites to Fody Fuels as being the difference. You say that being in commerce is so broad that it includes all goods and commodities. Which is this? This is an investment in real estate. Is it a good or is it a commodity? Well, under the definition of the, of the Vermont Consumer Fraud Act, it says that, that, that goods or services includes goods, any objects, wares, goods, commodities, work, labor, intangibles, course of instruction or training, securities, bonds, ventures, stocks, real estate, and other properties, and any service of any kind. So. Okay, now, Fody Fuels has a text in which they're talking about how, how the requirement is, is narrowed, right? I mean, we've all been talking about that text. Right. How do you narrow it? What's the principle of narrowing? Well, I think that the principle of narrowing that they, they were focusing on Fody Fuels is, is in Fody Fuels, there was two individuals who were having, who for two years worked together as a, for this one transaction. He was originally going to buy it. No, no, I'm just speaking generally. Oh, generally, I. What's the limiting principle? I, I think. You just read a whole long list of things and I can't imagine anything that isn't in there. Sure. I think the limiting principle here, which I think Fody Fuels defines, is, is danger to the public. Okay. And so, for example, in Fody Fuels, it's, it's just a transaction between these. What's the danger to the public here? This is a, a private offering of a, of a, of a, you know, million-dollar investment involving out-of-town real estate? Yep. And, and the. You think the people walking around the street in Rutland are in danger from this? I think they, they are. Mr., Mr. Dole was. The fact of the matter was anybody at that time doing a 1031 exchange. You're saying Mr. Dole was. I mean, that's, that is really foreshortening the whole argument. No. To, to the conclusion. The question is, what's, what is the limiting principle that, that works? I mean, and, and, and if it's danger to the public, I, I'm not sure, I'm not sure that helps you. Well, I, I think it does, Your Honor, because in this case, there were 60 other people who lost a, a considerable amount of money as a result of this investment scheme. From Vermont? No, not from Vermont. But, that, but they, the question is whether it was held out to the public. It's not a question of whether it's just held out to the public in Vermont. I know this is extra record. Did any of those other people win on common law fraud? I don't know what some of the other people did in terms of the, the company, DISS, filed bankruptcy so that they went through the bankruptcy proceedings and I, my understanding as well is that they didn't, were not able to recover anything. The only reason that Mr. Adams, Mr. Adams took a special interest in Mr. Dole in trying to encourage him to, to run and he's the one who engaged Mr. Dole, made, made specific statements to Mr. Dole, so he acted as a solicitor. And, and that's why he is personally liable to us, something he didn't do with many of the other people. Okay. I did reserve time for rebuttal, but if there's another question beforehand. We will hear you then, sir. Thank you very much. Mr. Miller. Good morning. Good morning. If it pleases the court, my name is Adam Miller. I represent the defendant and appellee, William Adams. The narrow issue before the court is does Mr. Dole's amended complaint allege an in-commerce transaction? My, the trial court answered no, and my comments today will highlight the most narrow way to affirm. Foddy Fuels, besides the test you've been talking about on the public offering, also requires Mr. Dole to allege that a potential, a prohibited practice with potential public harm. In our case, the amended complaint alleges that Mr. Adams twice misrepresented the transaction to Mr. Dole, once in a private meeting. And the second time in follow-up emails, all communications were just between Mr. Dole and Mr. Adams. The subject matter of those communications was Mr. Dole's transaction. For instance- Were there no other offers made elsewhere? At least, I understood your adversary to suggest, Mr. Nolgo, to suggest that these things were available and put out there, at least for some public consumption. Yes, Your Honor, and speaking outside of the fact selection in the complaint, yes, DIS offered, I believe, three different investments to people, all of them were other clients who invested in similar products. You're focusing on us. I'm going to focus on those. Yes, so- Was this offer widely distributed, the offer from Mr. Adams to offer people this lease-back and tax-saving program? Was it offered widely? No, Your Honor, Mr. Adams never offered this to anyone. This was offered by DIS exclusively through a private broker. And again, speaking outside of the complaint, Mr. Dole hired a broker to arrange this transaction to represent him. Mr. Adams spoke to Mr. Dole, and that conversation is the basis of this action. Well, hiring a broker doesn't seem to break any chain. I mean, if he bought a house for his residence, that would surely be covered by the statute, wouldn't it? Potentially, it would, Your Honor. If it's a one-on-one transaction, that's the way- if you go to the doctor and get a just-exactly-what-your-doctor-wants, that's in commerce, that would be covered, wouldn't it? If it met the two-part test and 40 fuels, it was offered to the public, and it- You have a pharmacy, and you're going to do prescriptions, but what you're doing is formulating something very specifically for a particular doctor's particular patient. It seems like that is being offered to the public as well. Yes, Your Honor, I would- So how do you- and that would be a one-on-one. I mean, you go in, you don't share your prescription with the public. You go in, you talk to the pharmacist. It's even confidential. So how do you- what is the limiting principle that you can rely on? Good question, Your Honor. In your hypothetical, the limiting factor from 40 fuels would be public protection. So if the pharmacist were to, in that private consultation, make a misrepresentation about the drug, and there's no way that that misrepresentation could get out to the public, then it would be a purely private misrepresentation outside of the consumer process. Does it have to be a private representation, or is the issue whether the service of formulating pharmaceuticals or selling something is offered to the public? If I go to buy a house, I don't have a whole lot of people around. I'm just talking to the broker, and there's this one house, and that's in commerce. So that doesn't seem to work for you either. Uh, you're right. And we have, um, we have cases that generally highlight that. I would say in 40 fuels, they focus on a transaction that's offered to the public, and frauds are the prohibitive practice, uh, that has a potential public harm. Uh, and, um, the real estate cases that you cite would be like Carter. Uh, Carter is not a private communication. It's public. The real estate agent publicly listed a property on, uh, an MLS listing, and that public, yes. You're saying the acts or practices are the things that have to be in the consumer marketplace, and, uh, in this instance, the misrepresentations, which were made one-on-one, um, were not made in the marketplace even if, hypothetically, even if this, these transactions were offered generally to all the residents of Vermont who had more than a million dollars. That's correct. And, and we dispute that it was offered publicly also, but the most narrow ways, even if it was, uh, there's no way that private communications, um, alleged in the complaint, uh, could possibly harm anybody else. And Mr. Dole doesn't argue otherwise. Uh, the ways that he argues in the, in the few instances which he's in, uh, address this requirement of a, uh, potential public harm, he either brings in outside information, outside of the complaint, new allegations, uh, which he then says those, uh, demonstrate a potential public harm. The issue is not whether, whether the, the, whether the transaction is one that is in commerce, according to you. It's whether the, that which makes it dangerous to the public was made to the public in this representation, the fraud, the concealment, or, or whatever. That's correct. Uh, and if you, the rules that Fote Fuels is relying on here, both come, they both come from Zeman, which is a, a Georgia appellate court. Uh, and Zeman's is also a real estate transaction. In that case, uh, the real estate agent publicly listed an MLS offering. Now, that would meet the public offering requirement, but the, there were no frauds in that offering. The frauds occurred in a private communication when, when the real estate agent was showing the house, and the court was highly skeptical of that posing any public harm. So, yeah, I know we're hypothetically, but what, in your view, would this deal look like if it were to be encompassed under the Act? If it would be assumed, or addressed under the Act? What would have to have happened here? Uh, well, I think it would be, you know, if DIS had a website and offered this out, or was trying to give it to somebody, or, or even if offered through a broker did meet that element of a, a public offering, there would still have to be some kind of communication that there was a fraud like, um, potential errors in, or misrepresentations in the offering documents that could somehow get out to other people. So, if a broker had a scheme, and, uh, had a, uh, you know, a, a script that she was reading from in order to sell these things, and just said, I've got these here, but then privately repeated the, the fraud in the script each time she talked to somebody privately, would that be encompassed? And how does that? Against the broker, or against my client? Yeah, against your, the hypothetical. Uh, not, I'm, I don't know that DIS would have any, I mean, conceivably it could fall within, um, yeah, if, if DIS were encouraging their brokers to go lie about the transaction to everybody, or, or that there were misrepresentations in the documents that went out to, to everybody, um, then, yeah, conceivably that would, that would strengthen the argument, but that's not alleged in the complaint. The complaint only... ...doesn't do what Judge Jacobs was doing, or at least get some parameters on this. Ok. If I could highlight one more issue, which I think is a, a confusion within the... Yeah, you have one more minute. The argument. Um, uh, this, this, uh, this appeal only governs the in-commerce requirement. Now, Mr. Dole would also, to be actionable under the Consumer Fraud Act, have to prove private party standing, which addresses things like, um, it, it addresses the proper parties before the court, if not the Attorney General, like, uh, and it uses terms like, Mr. Dole is a consumer. Mr. Adams is a solicitor, that this involved real estate. Uh, all these arguments address private party standing, which was part of our argument in the trial court, which the trial court never ruled on. They found moot because they didn't find it in-commerce. And I'd like to just distinguish those arguments. You just want to make sure if you lose on this narrow issue, you, you don't go down the tubes. Well, I appreciate that, but, uh, more so, I would like to highlight it so that the court doesn't confuse the, the arguments that, uh, Mr. Dole makes about private party standing, which he makes to try and show that, uh, it, it either bypasses in-commerce analysis or, or somehow inherently shows in-commerce analysis. And I see that my time is up, so, uh, if I could just briefly summarize, uh, applying the facts from the omitted complaint to Foddy Fuels, the controlling law, uh, Mr. Dole has not alleged an in-commerce transaction, most narrowly because it poses no harm to the public. I thank the court for their time. I'll hear from my, thank you, Your Honor. Uh, first off, I just want to make sure that the court is clear that the transaction is the one that, whether or not the transaction is commerce, is the one that DIS is offering. And that's what the court has to rule on, what, is whether or not what DIS was offering through the public offering was a, a commercial transaction. Is the misrepresentation alleged to be in that which was offered to the public? Um. Or, or it, or was it in one-on-one conversations? Yep. And, and I don't think it needs to be. The, the, the fraudulent convict can communicate. Well, I understand that it, yeah. The, the answer is both, okay? DIS did make false misrepresentations by omission by failing to state what had happened to the market before my client got in. The fact that they were, they were no longer solvent, uh, and that they were using my client's money to pay back taxes on property, which they had not been able to pay and were going into default on some of their loans. They needed this, this money, over a million dollars, as you can see, uh, in order to bulk up and not, and not, not have the whole thing go down then. Um, so they were basically, at this point, it was a Ponzi scheme. This is alleged in the complaint. Well, that part of it, see, this is the, this is the thing, I, I, I. The thing. Well, well. Is that alleged in the complaint or not? That it was a Ponzi scheme? I don't know that we, we alleged that. All of those other things you were talking about, you listed three or four things. Uh. They were insolvent, that they needed the million dollars. I mean, who doesn't need a million dollars? Yeah. And so. Some of those were not alleged in the complaint because they did not come out until after discovery. But what's important about this motion, it was not just a motion for default, the judgment on the, on the, on the pleadings. He filed a combined judgment on the pleadings and summary judgment motion at the same time. And all those pleadings were put in, all that information was put in in our response, uh, to that motion with affidavits and otherwise. This motion for default judgment came after all the discovery had been done years, uh, uh, afterwards. So, uh, I see that my time is almost up. But, so I want to make that clear. So, uh, um, so, so the, the, the, the, I think the court should not just limit its discussion to the, the, the, the complaint. But should also look at this as a summary judgment motion. Because they offered affidavit, you know, information affidavits and additional documents. So, the reason we should not limit it just to the complaint, but to look at the filings as well, is because you concede that what, what must be in commerce is the, the falsehood, the misrepresentation, or the, or the omission, rather than simply looking at a transaction and say, this is, this is in commerce. It deals with stuff that people buy and sell. No, I think that, I, I disagree with that. I think that the issue is whether or not this transaction occurred in commerce. And then, and that's what this court, the trial court decided. The secondary thing which we never got to was, was it fraudulent? And that's what we didn't get a chance to argue because he decided, the court below decided that it was not in commerce. Thank you, thank you both. We will reserve decision.